BROTHERHOOD OF LOCOMOTIVE ENGI-
NEERS et al. v. CHICAGO, M., ST. P. &
P. R. R. et al. (BROTHERHOOD OF LO-
COMOTIVE FIREMEN AND ENGINE-
MEN et al., Interveners).

No. 189.

District Court, E. D. Wisconsin.

Oct. 21, 1941.

Robert P. Pike, of Mayville, Wis., Alex. J. Brown, Jr., of Chicago, Ill., and Clarence E. Weisell and Harold N. McLaughlin, both of Cleveland, Ohio, for plaintiffs.

Rodger M. Trump, of Milwaukee, Wis., and C. R. Sutherland, of Chicago, Ill., for defendants.

Ralph M. Hoyt, of Milwaukee, Wis., and Harold C. Heiss, of Cleveland, Ohio, for interveners.

DUFFY, District Judge.

This is an action for a declaration of rights under the Declaratory Judgment Act, 28 U.S.C.A. § 400, and for other relief under the general equity jurisdiction of the court.

Plaintiffs are the Brotherhood of Locomotive Engineers (hereinafter referred to as the "B. of L. E."), a voluntary, unincorporated association, together with A. Johnston, Grand Chief Engineer of the Brotherhood, and Perry L. Gray, who is the General Chairman of the Committee of Adjustment of the Brotherhood for the Eastern Lines of the Chicago, Milwaukee, St. Paul and Pacific Railroad. The action was instituted on behalf of and as the representative of all members of the B. of L. E. and all other engineers similarly situated, whether or not they are members of the Brotherhood.

Defendants are the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (hereinafter called the "Company"), a corporation, and Henry A. Scandrett, Walter J. Cummings, and George I. Haight, Trustees of the Company who were appointed by the U. S. District Court for the Northern District of Illinois under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205.

Because they had a substantial interest to protect, this court, on August 23, 1940, permitted the Brotherhood of Locomotive Firemen and Enginemen (hereinafter called the "B. of L. F. and E.") to intervene under Rule 24(b) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, relating to the permissive intervention of third parties. See 34 F.Supp. 594.

This suit involves the construction of a contract known as the "Mediation Agreement"[1], dated November 16, 1929, entered into by the B. of L. E. and the Company for the regulation of rates of pay, hours of labor, and conditions of work for all engineers in service on the lines affected. It is plaintiffs' contention that the Company's allegedly erroneous interpretation of a part of this Agreement, subsequently written into the Engineers' schedule as Rule 24(g), Paragraph Third, as to mileage regulation in certain classes of service, is a violation of plaintiffs' substantive rights under the Railway Labor Act, as amended, 45 U.S.C.A. § 151 et seq.

### Historical Background.

In order to understand the exact nature of the controversy before the court, it will be necessary to consider a few of the fundamental principles concerning the subject of mileage regulation and the parties and organizations concerned therewith, so far as this controversy is concerned.

The B. of L. E. is a voluntary, unincorporated association of locomotive engineers employed on the railroads of the United States and Canada. It was organized in 1863, and has a present membership of approximately 63,000.

Members of the Brotherhood are divided into so-called "local divisions", or lodges, located on the different railroads, usually at a division terminal of the particular road. Each lodge has a committee called the "Local Committee of Adjustment", whose function it is to handle local disputes and grievances. Wherever two or more local lodges are organized on one road, there is formed a "General Committee of Adjustment", which is composed of the chairmen of the local committees located within the territory subject to its jurisdiction. The General Committees of Adjustment are given the right to make and interpret contracts with the particular railroad with which they are connected, and they also supervise rates of pay and conditions of work, and determine questions of seniority, rights to runs, and jurisdiction of territory.

Customarily, where a railroad is operated under the jurisdiction of two or more managers, the Brotherhood organizes a General Committee of Adjustment for each division. In the case of the defendant Company, there are two such General Committees, one for the Lines East and another for the Lines West.

Completing the framework of the Brotherhood is the "Grand International Division", or "G. I. D.", which is the supreme governing body. It meets every three years and is composed of its international officers and delegates from the local divisions. It enacts the basic laws for the government of the organization and formulates policies to guide it until the next convention.

Each railroad operates several classes of service. These are: assigned passenger service, extra passenger service, assigned freight service, unassigned freight service (also called "pool" service), road freight extra service, assigned yard service, and extra yard service. Engineers are assigned to lists, or boards, which cover each of these classes of service, and those so assigned usually perform all of the work necessary in that particular class. For example, the men on the pool list divide between themselves (running "first in, first out") the total mileage run between two terminals by trains operating in the pool service in a month's time. Men on the extra list, who are called to supply vacancies when the engineers on any of the other lists are unavailable, are similarly drawn in rotation and divide among themselves the total extra mileage available during a month.

Since engineers are paid according to the number of miles they run (the basic unit of pay being each 100 mile trip), mileage regulation is in effect wage regulation. Consequently the engineers are interested in obtaining the highest possible mileage per month. The purpose of mileage regulation is to spread the available work among as many engineers as possible, and at the same time insure an adequate wage to those who do work. Without this regulation, the mileage of the individual engineers would depend only upon the amount of work available and the number of engineers available to do that work.

Incorporated into the engineers' schedules, therefore, are provisions to effectuate this purpose. Based upon the principle of seniority, lists of available engineers

---

[1] The Agreement affects only the lines of the Company running east of Mobridge, South Dakota, referred to as "Milwaukee Lines East".

are drawn up for each class of service. Then it is determined, as near as possible, what the total mileage will be, which will be available during the next period of time before another check is taken. Only that number of engineers will then be called to duty so that, as a group, they may average a certain number of miles per month. A minimum and a maximum figure is set; and as long as the group averages between these two figures, no adjustment of the lists is necessary. If, however, a subsequent check shows that the group as a whole is averaging a lesser number of miles per month than the minimum set in the schedule, a number of .engineers, in the reverse order of their seniority, will be taken off the list so that the group may again average between the maximum and the minimum figures prescribed. Conversely, if the check shows that the group is averaging a greater number of miles than the maximum prescribed, additional engineers, according to their seniority, will be placed on the list until the group average is again within the limits provided in the schedule.

It will be noted, of course, that the list adjustments are made only with reference to the group averages. Individual engineers may have more mileage or less than the average; individuals may go above the maximum for the group, or below the minimum, without any adjustment of the list being necessary. To correct this situation, the schedules provide that when an individual engineer has exceeded the maximum mileage permitted, all extra mileage made by him will be charged to him the following month. In practice, engineers may be required to lay off for the rest of the month upon reaching the maximum.

The higher that the minimum and maximum figures are set, of course, the more mileage (and higher wage) will be obtained by the individual engineers who are on the lists. At the same time, high maximums and minimums tend to restrict the number of engineers employed.

For more than forty years, the B. of L. E., through a General Committee of Adjustment, has represented the engineers engaged on defendant Company's Eastern Lines. For the past thirty years, it has had a contract, or schedule agreement, with the Company.

The B. of L. F. and E., representing the firemen employed on the Eastern Lines, also has a contract with the Company. For reasons which will hereafter appear, the working schedules of both engineers and firemen are closely interrelated, and any change in one schedule will affect the working conditions of the other. Consequently, the two Brotherhoods, on May 17, 1913, entered into what was called the "Chicago Joint Agreement". Among other things, the Joint Agreement attempted to regulate engineers' and firemen's mileage rules. Although it originally was an agreement between the two Brotherhoods, in 1919, by order of the Director General of Railroads, the mileage regulations contained therein were written into the contracts which both organizations had with the Company. The Agreement was amended in 1918 and again in 1923. The changes made were also incorporated in the new schedules with the Company. Thus, the 1924 schedule for engineers on the Eastern Lines conformed with those contained in the Joint Agreement as amended in 1923.

In the Joint Agreement, as well as the 1924 contract between the B. of L. E. and the Company, there were provisions to the effect that engineers removed from their assigned lists could work as firemen, displacing any regular fireman who was junior in point of service. Firemen who were also qualified engineers might be placed on the engineers' lists only in the event that additional engineers were needed and none on the regular lists were available. The Agreement provided that the engineers could be returned to service as soon as it could be shown that (1) those on the pool lists had averaged the equivalent of 3,500 miles per month; (2) those on the road extra lists had averaged the equivalent of 3,100 miles per month; and (3) those on the yard extra lists had averaged the equivalent of 30 days per month. The Joint Agreement also contained a clause providing for its abrogation by either of the Brotherhoods; and in conformity therewith, the Agreement was abrogated by action of the 1927 B. of L. E. Convention, effective October 1, 1927. This convention adopted new mileage rules for engineers which increased the mileage governing additions to the pool lists from 3,500 to 3,800 miles per month; the mileage governing additions to the extra lists from 3,100 to 3,800 miles per month; and the mileage governing yard extra service from 30 to 35 days per month.

It became the duty of the General Committees of Adjustment to attempt to incorporate these new schedules into the contracts which each Committee had with its respective railroad company. Accordingly, on September 2, 1927, the General Committee of Adjustment for the Milwaukee Lines East notified the Company management of its desire to change the existing schedules. On December 8, 1927, the management wrote the General Committee that it could not agree to the changes proposed unless the objections made thereto by the B. of L. F. and E. were first overcome.

A period of inactivity followed this exchange. The Company was unable to obtain the consent of the B. of L. F. and E. to such proposed changes. In 1929 the B. of L. E. became more and more insistent that the new schedule be adopted, either with or without the approval and consent of the Firemen. Finally, in the summer of 1929, the General Committee took a strike vote, whereupon it appeared that 93% of the engineers were in favor of a withdrawal from service unless the Company agreed to revise the schedules in a manner satisfactory to them.

Thereafter, conferences were held between the responsible heads of the B. of L. E. and the Company. The services of the United States Mediation Board were invoked. Finally, late in October, 1929, an agreement known as the "Mediation Agreement" was reached, reduced to writing, and printed in the form of a new schedule for the Engineers.

## The Issues Involved.

Specifically the controversy here is over the correct interpretation and application of Rule 24(g) of the new 1929 schedule, pertaining to mileage regulation. Rule 24 (g) provides as follows:

"When, from any cause, it becomes necessary to reduce the number of engineers on the engineers' working lists on any seniority district, those taken off may, if they so elect, displace any fireman their junior on that seniority district under the following conditions:

"First: When reductions are made, they shall be in reverse order of seniority.

"Second: No reductions will be made so long as those in assigned or extra passenger service are averaging the equivalent of 4000 miles per month; in assigned, pool or chain gang freight, or other service paying freight rates, are averaging the equivalent of 3200 miles per month; on the road extra list are averaging the equivalent of 2600 miles per month, or those on the extra list in switching service are averaging the equivalent of 26 days per month.

"Third: Engineers taken off under this rule shall be returned to service as engineers in the order of their seniority and in their respective class of service, as soon as it can be shown that those in extra passenger service average the equivalent of 4800 miles per month; in pooled, chain gang or any other unassigned service paying freight rates average the equivalent of 3800 miles per month; on the road extra list average the equivalent of 3800 miles per month, and on the extra list in switching service average the equivalent of 35 days per month.

"On road extra lists a sufficient number of engineers will be maintained to keep the average mileage, or equivalent thereof, between 2600 and 3800 miles per month.

"In assigned yard service, regulation will be made by requiring each regularly assigned engineer to lay off when he has earned the equivalent of 36 days per month.

"In extra yard service, a sufficient number of engineers will be maintained to keep the average earnings between 26 and 35 days per month.

"Fourth: In the regulation of assigned and extra passenger service, a sufficient number of men will be assigned to keep the mileage, or equivalent thereof, within the limitations of 4000 and 4800 miles per month; in assigned, pool, chain gang or other service paying freight rates, a sufficient number of men will be assigned to keep the mileage, or equivalent thereof, within the limitations of 3200 and 3800 miles per month.

(Paragraph Fifth omitted because not material)

"Sixth: In regulating the working lists in the respective classes of service, each list will be handled separately. In the regulation of mileage, neither the minimum nor the maximum is guaranteed.

* * * * * *"

Plaintiffs began suit because of defendants' allegedly erroneous interpretation of Paragraph Third of Rule 24(g), with respect to pooled, chain gang, or other unassigned service paying freight rates, the road extra list, and the yard extra service.

Other classes of service are not the subject of this action.

Plaintiffs' construction of the contested section of the rule briefly is as follows: that Paragraph Third states the conditions which must exist before any engineers not on a particular list may be added thereto; that as to pooled, chain gang, or any other unassigned service paying freight rates, the road extra service, the condition precedent is that the engineers in each respective class of service, as a group, must average the equivalent of 3800 miles per month; and that as to the extra list in switching service (the yard extra list), the condition precedent is that the engineers in this service must average, as a group, the equivalent of 35 days per month. Plaintiffs contend that when a check shows that the maximum averages, as listed in this Paragraph, are exceeded by the group in any particular service, then, *and only then,* may the list be adjusted by the addition of more engineers, so that thereafter (or until a subsequent check shows that a further adjustment is necessary) the group, as a whole, will again average between the maximum and minimum mileages provided in the schedules. The converse situation appears when a check shows that the engineers on a particular list are averaging less than the minimums set forth in Paragraph Second. When this situation exists, then engineers with the least seniority will be dropped from the lists so that the group may again, as a whole, average between the minimum and the maximum mileages contained in Paragraphs Second and Third respectively. At no other time, however, can engineers be dropped from the lists.

The B. of L. F. and E. is of course interested in keeping the engineers' minimum and maximum mileage schedules as low as possible, because the higher such schedules are, the fewer firemen will be able to work as engineers, and the more engineers will be working as firemen, displacing regular firemen who are their junior in seniority. Employment as an engineer is more desireable than as a fireman. The interveners, therefore, strongly contend that to interpret the Mediation Agreement as contended for by the plaintiffs would mean that the railroad would have to violate the agreement that the firemen had and still have with the Company. Firemen's Rule 25(g) corresponds with engineers' Rule 24 (g), and prior to the Mediation Agreement, the terms were entirely consistent. As an answer to plaintiffs' construction, both interveners and defendants point to the provision in Paragraph Sixth of the engineers' rule, heretofore quoted, to wit:

"* * * In the regulation of mileage, neither the minimum nor the maximum is guaranteed."

All parties introduced considerable testimony relative to the circumstances surrounding the making of the Mediation Agreement. This evidence, first offered by the plaintiffs, met with strenuous objections on the part of the defendants and interveners, who contended that the language of the contract was clear and unambiguous, and that parol evidence was not properly receivable. However, the very fact that such a blazing and emphatic difference of opinion has developed, as to the meaning of the words in the contract, is perhaps the best evidence that an ambiguity did exist.

Events Leading up to Mediation Agreement.

After the strike vote had been taken, the services of the United States Board of Mediation were invoked, and one O. B. Colquitt, a member of the board, arrived in Chicago on October 7, 1929. After determining that the dispute was between the B. of L. E. and the Company, Colquitt arranged for further conferences between the railroad officials and the representatives of the Brotherhood. Mediation was not successful, and Colquitt left Chicago on October 18, 1929, requesting both sides to continue their efforts to arrive at a peaceful solution.

The main stumbling block to granting the demands of the engineers was the attitude taken by the B. of L. F. and E. That organization, through its spokesman, Timothy Shea, had served notice on Mr. J. T. Gillick, the General Manager of the Company, that should the engineers' schedule be changed in conformity with the demands of the General Committee, the firemen would strike. Any change of the engineers' schedule which would tend to affect adversely those of the firemen was unacceptable to the latter. The firemen also contended that such a change would be a violation of their contract with the Company, as provided in Rule 25(g) (4) of their schedule. Although the firemen had taken no strike vote, Gillick believed that they would make good their threat; and it was

the attitude of the Company that if a strike were to be called, it would prefer to have the engineers on strike rather than the firemen.

In a conference on October 22, 1929, A. Johnston, Grand Chief Engineer, and R. E. Edrington, Assistant Grand Chief Engineer, represented the B. of L. E., while the Company was represented by J. T. Gillick, its General Manager and C. M. Dukes, his assistant. Johnston threatened again at this conference to call out the engineers if their demands were not met. At this meeting, in addition to the matter of mileage regulation, the question of a new representation rule for the engineers was also discussed.

On October 28 another meeting was had. The question of the new representation rule was .adjusted and settled. At first, neither side had made any concessions with reference to mileage regulation. Finally an agreement was reached, and the parties who negotiated the agreement are in sharp conflict as to how this agreement was brought about. Edrington and Johnston, who testified from memory, are in agreement. Gillick and Dukes, each having refreshed his memory from notes taken at the time the conference was held, are in agreement with each other, but are in utter disagreement with Johnston and Edrington. In any event, on the day following the last conference, Edrington and Dukes met in order to reduce the agreement to writing. The Mediation Agreement heretofore quoted was the result of their joint efforts. On October 31, the mediator, Colquitt, was recalled. The parties signed the agreement and it was approved by Colquitt. It was the emphatic testimony of Gillick and Dukes that the solution of the controversy was reached when the clause in Paragraph Sixth was suggested, to wit:

"* * * In the regulation of mileage, neither the minimum nor the maximum is guaranteed."

The representatives of the B. of L. E. claim this clause was not discussed.

## Conclusions.

Interveners contend that the plaintiffs have lost their right to relief by reason of laches. In order not to extend this necessarily long opinion, it will suffice to say that this defense has been given careful consideration and interveners' contention in respect thereto is overruled.

■ There is considerable force to the argument of defendants and of interveners that nowhere in the provisions of the schedule in question are the engineers given the absolute right to average the maximum number of miles or days named in Rule 24 (g). The only subject covered in Paragraph Third is when engineers taken off under the rules shall have the right to return to service. There is a marked difference between a provision in a contract which would grant engineers the right to average 3,800 miles per month, and the provision in the schedule that they shall not average more than 3,800 miles per month.

Paragraph Second of Rule 24(g) states that no one shall be taken off the engineers' working list in pooled freight service until the engineers on that list have averaged 3,200 miles per month. This is the only direct statement in the entire set of rules as to how long an engineer shall have an absolute right to work each month. If Paragraph Third can be construed as granting the right of engineers to work 3,-800 miles, then Paragraph Second, giving the right to work 3,200 miles, is quite meaningless and would be in conflict.

However, the provision in Paragraph Sixth, "* * * In the regulation of mileage, neither the minimum nor the maximum is guaranteed," would seem to be controlling. Under the plaintiffs' interpretation, this clause does not refer to the regulation of mileage, in spite of its specific wording to that effect. It is the plaintiffs' contention that the railroad desired to be protected against paying for a minimum mileage, and therefore suggested the clause. Plaintiffs contend that for some years past, the B. of L. E. has been attempting to obtain from the railroad companies throughout the country a minimum mileage guarantee for engineers. Such a guarantee would provide that if, for example, the minimum mileage for a particular kind of service should be 3,000 miles per month, and an engineer in that class ran only 2,500 miles in one month, that engineer would nevertheless be paid for the entire 3,000 miles, 500 of which he did not run. Plaintiffs admit that the railroad companies have very seldom written this provision into the rules or schedules. It is admitted that no such claim for minimum mileage had ever been made on the lines in question, and plaintiffs' witness knew of only one specific case in the entire country.

It is difficult to believe that the railroad company could have been greatly concerned with the possibility of such claims being made, where there had been no record of such claims being presented in the past. It is also difficult to agree with the plaintiffs' argument that the clause, "* * * In the regulation of mileage, neither the minimum nor the maximum is guaranteed," does not refer to the regulation of mileage. It would be an unusual construction of a thirteen word clause to ignore entirely the first five words thereof.

It would seem to be entirely logical that the "maximum-minimum" clause refers to, and should be read in connection with, the Second and Third Paragraphs. So read, it means that the maximum-minimum mileages provided for are not guaranteed; that engineers may be added to the lists at any intermediate point between the maximum and minimum mileages; and that the only condition for such addition is that the respective groups must average between the two extreme mileage figures. Paragraph Fourth bears out this interpretation, providing, as it does, that a sufficient number of engineers will be assigned "to keep the mileage, or equivalent thereof, within the limitations of 3200 and 3800 miles per month."

It is likewise difficult to reconcile the present contention of the plaintiffs with the letter of June 17, 1930, written by Robert R. Stockwell, the B. of L. E. General Chairman of the Milwaukee Lines East. Mr. Stockwell was a participant in the negotiations leading up to the Mediation Agreement. The letter contains the following paragraph: "We agree that neither the maximum nor the minimum is guaranteed, but it is our understanding that the mileage should be regulated between these figures as conditions warrant and that the company is as responsible for the violation when there is an order to ignore the minimum as they would be on the maximum figure of the contract."

Whether or not there were some of the representatives of the plaintiffs who did not interpret the rule as indicated in Mr. Stockwell's letter, it is quite certain that the officials of the railroad company never understood or interpreted the rule as contended for by the plaintiffs. There was never a meeting of the minds which would justify such a construction. Furthermore, the language used is such that the plaintiffs' interpretation cannot be maintained.